UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NAIMA WARTTS,                    )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )        Case No.  4:07CV1111 CDP
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
        Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Naima Wartts's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et*

*seq*. and supplemental security income benefits under Title XVI of the Act, 42

U.S.C. §§ 1381 *et seq*.  Wartts claims that she is disabled because she suffers from

bipolar affective disorder.  The Administrative Law Judge, however, found that

Wartts was not disabled.  Because Wartts claimed a solely nonexertional

impairment, but the Administrative Law Judge failed to consult a vocational

expert, I will reverse the decision and remand to the Commissioner for another

hearing.

## Procedural History

Wartts filed applications for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income Benefits on August 22, 2005. The Social Security Administration initially denied her applications on December 19, 2005, and Wartts timely filed a request for a hearing. On February 1, 2007, the ALJ issued an opinion upholding the denial of benefits. The Social Security Administration Appeals Council denied Wartts's request for further review on May 11, 2007. The ALJ's decision thus stands as the final determination of the Commissioner. Wartts filed this appeal on October 11, 2007.

## Testimony Before the Administrative Law Judge

At the time of the ALJ's decision, Wartts was thirty years old and lived with her mother. She has completed high school and three years of college. Wartts has had numerous jobs in the past, including work as a teacher's assistant, activity aide, newspaper intern, newspaper staff writer, stock clerk, and science lab assistant.

Wartts testified that she first experienced symptoms of mania, delusional behavior, and hallucinations in 1999 while at college in Atlanta. These symptoms caused her initial hospitalization. She then returned to St. Louis, her home town, where she was transferred to the custody of St. Mary's Hospital.

Wartts testified that she had worked in various jobs, largely in the field of education, since leaving school in 1999. She described her time working as an assistant kindergarten teacher as the most notable example of her bipolar symptoms. Wartts recalled suffering from depression during this period. She stated that she "would wake up with a feeling of not having the ability to face the challenges and the decisions of the day." The school eventually dismissed her for chronic absenteeism.

Wartts further testified that after the assistant teacher position, she had worked for both the Missouri Veterans Home and Anne Taylor. Between the two positions, Wartts had worked roughly forty hours a week. She experienced noticeable remission during this period. Wartts added that she had not begun daily work at the Veterans Home until noon, which had allowed to sleep in or "do whatever the symptoms necessitated" in the morning. She testified that she had never been absent from work during this period of roughly nine months. Wartts lost her job with the Veterans Home because of budget cuts. She then quit her job with Anne Taylor, telling her employers that she needed to leave because she would soon be married. Wartts testified that this reason for leaving was untrue. She attributed the motivation behind the statement to a "state of delusion" which landed her in the hospital the next day.

Wartts testified that she sleeps twelve-to-fifteen hours, going to bed around midnight and waking in the afternoon. She stated that she is unproductive during the day and that she often feels lethargic and detached. She also noted persistent feelings of inadequacy and "organizational lack." Wartts testified that she has never been suicidal but that she experiences emotional lows twice a month. She described these lows as difficult to overcome despite her medication, causing her to sleep up to twenty hours for two-to-three days in a row. Wartts's daily activities include reading, singing in the church choir, visiting relatives, cooking, writing letters, and watching movies. She stated she does not clean the house or work in the yard.

Ms. Teresa Schneider, a case manager with BJC Behavioral Health, testified at the hearing as well. She had worked with Wartts for a period of four or five months. Schneider testified that Wartts had called her on two occasions of depression during that period. Wartts had been experiencing a "lack of motivation, absence of pleasure in the things she normally enjoys doing, and difficulty even with personal hygiene." Schneider testified that she believed Wartts was compliant with the medication and directions given from doctors.

<u>Medical and Other Records</u>

Wartts has seen multiple psychiatrists, counselors and other professionals

concerning her bipolar condition. From the beginning of this case's relevant period on November 5, 2001 until June 2003, the record reveals that Wartts received no treatment other than medication therapy.

A. Dr. Richardson

On June 24, 2003, Dr. Thomas Richardson initially assessed Wartts. Dr. Richardson noted that Wartts's last episode of bipolar affective disorder had lasted from one year in the past until about five weeks before the meeting. He described Wartts as pleasant and intelligent. Despite Wartts's statements that she recently had been depressed, Dr. Richardson documented her speech as "coherent and appropriate," finding insight and judgment present. He reported a Global Assessment of Functioning ("GAF") score of 80.[1]

Dr. Richardson further evaluated Wartts during fourteen office visits

---

[1] The GAF Scale reports "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000). A GAF score of 80 sits at the most functional end of the 71 to 80 range, which may be associated with at most slight impairment in occupational functioning. Id. at 34. A score of 81 to 90 may be associated with "good functioning in all areas," and "no more than everyday problems or concerns." Id. A score of 61 to 70 may be associated with some difficulty in occupational functioning, but generally indicates that a person is functioning "pretty well." Id. A score of 51 to 60 may be associated with moderate difficulty in occupational functioning, such as "conflicts with . . . co-workers." Id. A score of 41 to 50 may be associated with serious impairment in occupational functioning, such as the inability to keep a job. Id. A score of 31 to 40 may be associated with major impairment in several areas including the inability to work. Id. A score of 21 to 30 may be associated with the inability to function in almost all areas, including work. Id. A score of 11 to 20 may be associated with some danger of self-harm or "gross impairment in communication." Id.

between July 15, 2003 and March 18, 2005. During these twenty months, Dr. Richardson reported a general fluctuation in Wartts's depression. While he initially diagnosed her as "moderately depressed," her depression worsened and improved twice. By April 20, 2004, Dr. Richardson found the bipolar disorder in remission and no depression. The next two visits in August and December of 2004 found Wartts's depression in continued remission. By their final meeting on March 18, 2005, Dr. Richardson's notes indicate that Wartts continued to make "excellent progress." He found "no evidence of depression" and the bipolar disorder in remission. Throughout the entire period, Dr. Richardson reported GAF scores ranging from a low of "50 to 60" on one occasion to a high of between 80 and 90 on six consecutive visits from February 6, 2004 to March 18, 2005.

B. Dr. Patel

Wartts was admitted to DePaul Health Center on July 29, 2005 for evaluation and treatment of mania. Dr. Parimal B. Patel completed a psychiatric evaluation of Wartts on July 31, 2005, where he noted that she had been "agitated, labile, crying at one moment, and elated the next." The evaluation indicated that Wartts had physically threatened staff. Dr. Patel diagnosed Wartts with bipolar affective disorder, "manic with psychotic features," with a GAF score of 15 to 20. Dr. Patel also noted environmental stressors of "poor coping skills,"

"noncompliance with treatment," and "limited insight."  Wartts was transferred to the inpatient psychiatric service for evaluation and treatment of psychotic exacerbation and mood instability.  She was discharged on July 31, 2005 according to the stipulated facts of both parties.[2]

Dr. Patel again evaluated Wartts on August 24, 2005, when she was readmitted to DePaul Health Center's inpatient psychiatric service for evaluation and treatment of psychosis, psychotic exacerbation, and mania.  Wartts complained that she was manic, not feeling right, and "getting too excited."  She described "having a lot of fast thoughts."  Wartts told Dr. Patel that she had relapsed after a psychiatrist through Metro Psychiatric decreased her Vivactil within the past week.  Dr. Patel diagnosed Wartts with bipolar affective disorder, "manic with some paranoia," with a GAF score of 20 to 25.  Dr. Patel noted that he questioned Wartts's compliance with treatment.

C.  BJC Behavioral Health and Dr. Kosuri

On August 19, 2005, Wartts received an initial assessment at BJC Behavioral Health upon the referral of Dr. Patel.  Wartts's symptoms were noted as insomnia, irritability, poor concentration, depression, and mania.  Wartts

---

[2] The record looks to reveal a discharge date of August 5, 2005 rather than July 31, 2005. The difference in time – although not insignificant – does not affect the decision.

reported here that the precipitator to her initial hospitalization at DePaul Health Center had been her decision to quit her job at Ann Taylor. Further, she reported that her grandfather's death less than two months earlier had been another contributing factor. Wartts stated that when Dr. Richardson retired in April of 2005, she had not kept her appointments for two months because she had been reluctant to see a new doctor. Wartts was diagnosed with bipolar disorder and a GAF of 50.

September 12, 2005 progress notes from Dr. Rao Kosuri, a doctor with BJC Behavioral Health, indicate a continued diagnosis of bipolar affective disorder. Dr. Kosuri's notes reflect a GAF score of 65.

D. Ms. Joan Singer

Consulting psychologist Joan Singer completed a mental residual functional capacity assessment on October 6, 2005. Wartts told Singer that she had not followed up with treatment for two months after her treating psychiatrist retired in April 2005. Singer found this fact significant, since Wartts had demonstrated the ability to perform substantial gainful activity level work from September 2004 until July 2005. Singer noted that it was "quite reasonable" to attribute Wartts's ability to engage in substantial gainful activity to her compliance with medication and follow-up care. Singer found it likely that with sustained treatment and

compliance, Wartts would be able to work at the level of her previous employment.  However, Singer determined in the final assessment that Wartts was capable of performing at least simple repetitive work on a sustained basis.

E.  Medical Opinion Evidence

Wartts offered as evidence an undated letter from Dr. Kosuri addressed to the "Department of Social Services, Division of Legal Services."  The letter states that Wartts is appealing the discontinuation of her Medicaid benefits.  It addresses her concern that without Medicaid, she can neither remain compliant with care nor seek the professional assistance necessary to maintain her basic health.  The letter states that Wartts has a mental illness that "interferes with her ability to maintain employment," and it also mentions that she is appealing for Social Security Disability Income.

F.  Other Records

Wartts offered as evidence a letter from her mother written to the "Medicaid Benefits Hearing Committee Members."  This letter stresses Wartts's need for benefits to continue receiving psychiatric care, hospitalizations, medication, and other intervention that allows her to cope with her mental illness.  The letter notes that Wartts has had many jobs, but that she struggles to hold jobs because of tardiness, absenteeism, and mental episodes.

Wartts also offered as evidence a May 2, 2006 decision of the Missouri Department of Social Services granting her Medicaid benefits. Without analysis, the decision concluded that Wartts met the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04, the listed impairment for affective disorders.

<u>Legal Standard</u>

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but it is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians

(4)     the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required, which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, she is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, then the Commissioner reviews whether the claimant can perform her past relevant work. If the claimant can perform her past relevant work, she is not disabled.

If the claimant cannot perform her past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

At this stage, if a claimant suffers from an exertional impairment, the

Commissioner's burden is satisfied by referring to the Medical-Vocational Guidelines ("the Grid" or "the Guidelines") of 20 C.F.R., Part 404, Subpart P, Appendix 2. However, if a claimant suffers from a non-exertional impairment as well, reliance upon the Grid is only permissible if "the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." *Harris v. Shalala*, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing *Thompson v. Bowen*, 850 F.2d 346, 349-50 (8th Cir. 1988)). Absent such a finding, evidence from a vocational expert or other similar evidence must be obtained establishing whether "there are jobs available in the national economy for a person with the claimant's characteristics." *Id.* (citing *Thompson*, 850 F.2d at 349). Furthermore, "where the evidence of exertional limitations is extremely limited, and the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment, resort to the grid is inappropriate." *Tennant v. Schweiker*, 682 F.2d 707, 709-10 (8th Cir. 1982). Rather, a vocational expert must be consulted. *See Foreman v. Callahan*, 122 F.3d 24, 26 (8th Cir. 1997).

## The ALJ's Findings

The ALJ found that Wartts was not disabled, considering her age, education,

work experience, and residual functional capacity for the full range of work.  He

issued the following specific findings:

1.      The claimant met the disability insured status requirements of
        the Act on February 14, 1999, the date the claimant stated she
        became unable to work, and continues to meet them through
        December 31, 2010.

2.      The claimant has engaged in substantial gainful activity since
        her alleged onset date.

3.      The medical evidence establishes that the claimant has severe
        bipolar affective disorder with psychotic features, but that she
        does not have an impairment or combination of impairments
        listed in, or medically equal to one listed in Appendix 1,
        Subpart P, Regulations No. 4.

4.      The claimant's allegations and testimony of symptoms
        precluding a wide range of work are found not fully credible to
        the extent alleged for the reason that they are not fully
        supporte4d by, or consistent with, the substantial medical and
        other evidence as more fully set forth above.

5.      The claimant has the residual functional capacity to perform the
        non-exertional requirements of work except for more than
        simple repetitive work.  The claimant retains the ability to meet
        the basic mental demands of competitive, remunerative
        unskilled work as she is capable of understanding, carrying out
        and remembering simple instruction; and responding
        appropriately to supervisors, coworkers and usual work
        situations; and dealing with changes in a routine work setting.
        There are no exertional limitations (20 CFR [§§] 404.1545 and
        416.945).

6.     The claimant is unable to perform her past relevant work

7.     The claimant is forty years old,[3] which is defined as a younger individual (20 CFR [§§] 404.1563 and 416.963).

8.     The claimant [has] a high school education and more (20 CFR [§§] 404.1564 and 416.964.

9.     The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 CFR [§§] 404.1568 and 416.968).

10.     If the claimant's non-exertional limitations did not significantly compromise her ability to perform work at all exertional levels, section 204.00, Appendix 2, Subpart P, Regulations No. 4 indicates that a finding of not disabled would be appropriate. If her capacity to work at all levels were significantly compromised, the remaining work which she would functionally be capable of performing would be considered in combination with her age, education, and work experience to determine whether a work adjustment could be made.

11.     Considering the range of work at all levels which th claimant is still functionally capable fo performing, in combination wit her age, education, and work experience, and using the above cited section 204.00 as a framework for decisionmaking, the claimant is not disabled.

12.     The determinations of June 16, 1999, and November 5, 2001, are administratively final and res judicata (20 CFR [§§]

_____

[3] As the Government notes in its brief, the ALJ's statement that Wartts was forty years old is a typographical error in light of the record reflecting that Wartts was thirty years old at the time of the ALJ's decision. The error does not affect the analysis of this decision.

404.957, 416.1457, 404.988 and 416.1488).

13.     The claimant was not under a "disability," as defined in the
        Social Security Act, at any time through the date of this
        decision (20 CFR [§§] 404.1520(g) and 416.920(g)).

In reaching these findings, the ALJ determined that Wartts's allegations
were not credible. The ALJ recognized that Wartts has a "severe impairment since
she has more than a slight abnormality having more than a minimal effect on her
ability to work." However, the ALJ found that Wartts's daily activities and the
medical records were inconsistent with an inability to work. The ALJ further
found that Dr. Kosuri's letter to the Missouri Department of Social Services,
arguing for the continuation of Medicaid benefits, should not be interpreted
outside its own context. He found that Dr. Kosuri's statement in the letter about
Wartts's illness interfering with her ability to maintain employment was "a
conclusory statement only, and inconsistent with" Dr. Kosuri's GAF assessment of
65. The ALJ found that it was "quite reasonable to attribute claimant's ability to
engage in substantial gainful activity to her compliance with medication follow-
up." The ALJ concluded that Wartts "retains the ability to meet the basic mental
demands of competitive, remunerative unskilled work." Based upon this
conclusion, and without consulting a vocational expert, the ALJ used the Grid as a

framework to determine that Wartts was not disabled.

## Discussion

Wartts raises two general issues on appeal from the final determination. First, Wartts claims that the ALJ's assessment of her credibility as to her subjective complaints did not satisfy the standards set forth in *Polaski v. Heckler*. Second, Wartts asserts that the ALJ failed to determine her residual functional capacity in the proper manner, specifically claiming (1) the ALJ erred in evaluating a treating physician's opinion and third-party evidence, and (2) the ALJ erred when he failed to base his decision upon testimony from a vocational expert. Because I find that the ALJ's failure to consult a vocational expert constitutes error that warrants reversal and remand, I will not address Wartts's other arguments in this memorandum.

Wartts argues that the ALJ offered "absolutely no rationale" for his determination that she is capable of performing simple repetitive tasks. However, psychologist Singer determined that with sustained treatment and compliance, Wartts would likely be able to work at the level of her previous employment. Singer determined that Wartts was capable of "at least" simple repetitive work. It is obvious from the record that the ALJ relied on Singer's assessment in choosing

the more conservative of these two possibilities.  In determining the issue, the ALJ

acknowledged that Wartts's symptoms limit her ability to work.  Still, he

concluded that the "evidence as a whole . . . is inconsistent with the presence of

impairments and symptoms precluding all types of work activity."  The ALJ found

that Wartts was unable to perform her past relevant work.

After making this determination, the ALJ relied upon the Grid as a

framework to determine that Wartts was not disabled.  Wartts claims that the ALJ

erred when he failed to consult a vocational expert at this point.  Because the law

supports this assertion, I will reverse the ALJ's decision.

 Wartts does not assert – and the record does not reveal – any exertional

impairments.  Exertional impairments describe a claimant's physical limitations, or

those that affect one's ability to perform physical labor.  *Gray v. Apfel*, 192 F.3d

799, 802 (8th Cir. 1999) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.

1998)).  Non-exertional impairments refer to pain and mental impairment.  *See id.*

Since Wartts's bipolar disorder is a non-exertional impairment, she claimed no

exertional impairments, and she was not able to perform her past relevant work,

the ALJ should have consulted a vocational expert.

The Government points out that the Guidelines take administrative notice of

"the numbers of unskilled jobs that exist throughout the national economy." 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(b). "Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." *Id.* If one views this section alone, as the Government does, then Wartts's bipolar disorder could not be said to diminish significantly her residual functional capacity to perform the full range of activities listed in the Guidelines. The Guidelines themselves recognize that unskilled work is plentiful in the national economy. In such a case, the ALJ's determination of Wartts's capacity for competitive, remunerative unskilled work would lead to the conclusion that Wartts is not disabled. However, Section 200.00(e)(1) of Appendix 2 states that

> "In the evaluation of disability where the individual has *solely a non-exertional* . . . impairment, determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this appendix 2. *The rules do not direct factual conclusions of disabled or not disabled for individuals with solely non-exertional types of impairments*."

20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(1) (emphasis added).

Interpreting this latter section, the Eighth Circuit has held that "the grids, consequently, do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." *Foreman v. Callahan*, 122 F.3d 24, 26

(8th Cir. 1997). Further, where there is no evidence of exertional limitations, and the challenge focuses on "whether the claimant has the emotional capacity to engage in sustained employment, resort to the grid is inappropriate." *Tennant v. Schweiker*, 682 F.2d 707, 709-10 (8th Cir. 1982). As a result, "in a decision by an ALJ leaning on the 'Guidelines' in some measure for its ultimate conclusion it would be difficult, if not impossible, to be certain that the 'Guidelines' had not unduly influenced the overall decision by tainting an area in which they should not have been considered at all." *Id.* at 710. Thus, where a claimant suffers from significant non-exertional impairments but no exertional impairments, an ALJ's conclusion that a claimant is disabled is "legally infirm" absent a vocational expert's testimony. *See Foreman*, 122 F.3d at 26.

The dispute here focused solely on Wartts's bipolar disorder, a non-exertional impairment. This disorder necessarily focuses Wartts's claims on her "emotional capacity to engage in sustained employment." *Tennant*, 682 F.2d at 710. Further, there is no exertional impairment claimed or at issue. Therefore, the ALJ's conclusion is legally infirm since he did not consult a vocational expert. For this reason, Wartts's claim must be remanded to the Commissioner for a new hearing including a vocational expert's testimony.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further development of the record as to the testimony of a vocational expert.

A separate judgment in accord with this Memorandum and Order is entered this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 23rd day of September, 2008.